SO ORDERED.

Dated: June 2, 2017



_Madeleine C. Wanslee_
**Madeleine C. Wanslee, Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| EPICENTER PARTNERS L.L.C.; GRAY MEYER FANNIN L.L.C.; SONORAN DESERT LAND INVESTORS LLC; EAST OF EPICENTER LLC; GRAY PHOENIX DESERT RIDGE II, LLC, | Case No. 2:16-bk-05493-MCW <br><br> Jointly Administered with: <br> Case No. 2:16-bk-05494-MCW <br> Case No. 2:16-bk-07659-MCW <br> Case No. 2:16-bk-07660-MCW <br> Case No. 2:16-bk-07661-MCW |
| Debtors. | |
| EPICENTER PARTNERS L.L.C. and GRAY MEYER FANNIN L.L.C., | Adversary No. 2:16-ap-00334-MCW |
| Plaintiffs. | |
| vs. | **MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS ADVERSARY COMPLAINT** |
| CPF VASEO ASSOCIATES, LLC, | |
| Defendant. | |

On February 2, 2017, the parties appeared for a hearing on the second Motion to Dismiss filed by CPF Vaseo Associates, L.L.C. in this adversary proceeding. The Court now issues this Memorandum Decision concluding that the Motion to Dismiss Plaintiff's First Amended Complaint should be granted in part and denied in part.

## BACKGROUND

The following are the facts of this case taken in the light most favorable to the non-moving party. In 2008, Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. ("May Debtors")[1] retained attorneys Simpson Thacher & Bartlett, LLP ("STB") to pursue and defend claims on behalf of May Debtors against Northeast Phoenix Partners ("NPP") and Desert Ridge Community Association ("DRCA") relating to real property located in Phoenix.[2] About six months into the litigation, STB informed May Debtors that it would no longer represent unless May Debtors unless they obtained litigation financing.[3] To that end, STB introduced May Debtors to Ganymede Investments Limited ("Ganymede") in late 2009 which agreed to finance May Debtors' litigation against NPP and DRCA.[4]

On December 22, 2009, May Debtors entered into a Forward Purchasing Agreement with Ganymede ("2009 Agreement"). Although May Debtors suggested changes and modifications to the 2009 Agreement, none of these suggestions were incorporated into the final document.[5] Additionally, STB refused to continue litigation unless May Debtors signed the 2009 Agreement and informed May Debtors' principal Bruce Gray ("Mr. Gray") that he was in no position to negotiate.[6] Pursuant to the 2009 Agreement, Ganymede paid STB $5,000,000 to continue the litigation against NPP and DRCA.[7] In exchange, Ganymede would be paid on a contingent fee

---

[1] Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. are referred to as the "May Debtors" because that is the month in which they sought bankruptcy relief. Other Debtors in these jointly administered cases, specifically Sonoran Desert Land Investors LLC, East of Epicenter LLC, and Gray Phoenix Desert Ridge II LLC, were filed in July 2016 and have been referred to during the proceedings as the "July Debtors." These five cases are jointly administered, but have not been substantively consolidated.

[2] See STB Engagement Letter dated December 9, 2008. The Engagement Letter also states: "We [STB] are committed to performing services for the Company to the best of our ability and with the independent professional judgment that an attorney owes to a client in accordance with both the Lawyer's Code of Professional Responsibility of the State of New York and its analogue in the state of Arizona where this case is pending."

[3] See First Amended Complaint, Paragraph 13.

[4] See First Amended Complaint, Paragraph 13.

[5] See First Amended Complaint, Paragraph 14.

[6] See First Amended Complaint, Paragraph 13.

[7] See Forward Purchase Agreement dated December 22, 2009, Schedule 1, Section 3.

basis 40% of any proceeds collected from the litigation, plus the $5,000,000 advanced through the 2009 Agreement.[8]  The 2009 Agreement defines proceeds as both cash and non-cash proceeds including real estate, contract rights, and annuities.[9]  It also states that the parties have a "common legal interest" in pursuing the litigation claim.[10]

The 2009 Agreement contains several conditions that expressly limit the nature of the parties' relationship.  For instance, it provides that the parties are not creating a joint venture or partnership.[11]  The 2009 agreement also states that May Debtors are "sophisticated and experienced, represented by counsel and with full access to [their] own legal advice."[12]  Schedule 4 provides a list of May Debtors' assets (including the litigation claim and nearly all of the May Debtors' personal property) and describes those assets as "collateral."  Section 7 requires May Debtors to give notice prior to assignment or disposition, in which case Ganymede may exercise a payout option (equal to $20,000,000) to terminate the 2009 Agreement.[13]  The 2009 Agreement expressly limits any obligation by Ganymede to continue to fund the litigation, or pay any associated expenses.[14]  Section 10 creates a general duty to cooperate with the Nominated Lawyers (in this case, STB).[15]

After May Debtors obtained Ganymede's financing, STB increased its rates to almost three times its previous invoice amounts.  STB also changed the nature of their fee arrangement with May Debtors by creating a "premium" under which STB would be paid 130% of its fees,

---

[8] See Forward Purchase Agreement, Schedule 2, Section 1(a).

[9] See Forward Purchase Agreement, Schedule 5, page 26.

[10] See Forward Purchase Agreement, Preamble, Paragraph D.

[11] See Forward Purchase Agreement, Section 16.1: "[May Debtors] and [Ganymede] are independent actors.  [The Forward Purchase Agreement] does not create any joint venture, partnership or any other type of affiliation, nor create a joint ownership of the Litigation Claim, for any purposes, including for U.S. federal, state and local income tax purposes."

[12] See Forward Purchase Agreement, Preamble, Paragraph (B).

[13] See Forward Purchase Agreement, Sections 7.1-7.2.

[14] See Forward Purchase Agreement, Section 9.1.

[15] See Forward Purchase Agreement, Section 10(b): "[May Debtors] shall at its own expense and in a timely manner: cooperate with [STB] in all matters pertaining to the Litigation Claim and promptly pay all costs and expenses necessary or reasonably desirable in association with the Litigation Claim."

including those previously billed, in the event it could secure a judgment at least three times its litigation fees.[16] When May Debtors complained about the rising litigation costs, STB and Ganymede informed May Debtors that May Debtors were no longer controlling the litigation costs.[17] The $5,000,000 paid to STB was supposed to represent the maximum amount STB would be paid for the entire litigation pursuant to STB's initial fee estimates provided to May Debtors.

In May 2010, May Debtors settled their claim against DRCA for $6,000,000. Of the $6,000,000, $4,000,000 was paid to Ganymede and $2,000,000 to STB.[18] A few months later, STB and Ganymede presented May Debtors with an amendment to the 2009 Agreement ("2010 Agreement").[19] Again, none of May Debtors' suggestions or proposals were incorporated into the 2010 Agreement.[20] The 2010 Agreement increased the amount Ganymede paid to STB by $1,100,000 and revised the schedule of payments to Ganymede. The 2010 Agreement was negotiated solely between STB and Ganymede and presented to May Debtors for signature.[21]

About six months after the 2010 Agreement, STB and Ganymede presented May Debtors with another amendment to the 2009 Agreement ("2011 Agreement"). Under the 2011 Agreement, Ganymede paid STB an additional $500,000.[22] The parties' relationship continued to sour with Ganymede and STB threatening May Debtors with default and demands for payment.[23] May Debtors executed another agreement ("2011 Supplement"). Pursuant to the

---

[16] See Amendment to Engagement Letter dated December 22, 2009: "All invoices rendered to [May Debtors] … will reflect a thirty percent discount to our usual fees for our fees … In the event [STB] obtains a judgment in [May Debtors'] favor for at least three times the amount of its fees incurred in prosecuting the case … [STB] will be paid a premium representing the difference between one hundred and thirty percent of its usual rates on all hours previously billed at the thirty percent discount less the amount of the discounted fees that have been paid."
[17] See First Amended Complaint, Paragraph 23.
[18] See DRCA Settlement Agreement dated May 13, 2010.
[19] See 2010 Amended Forward Purchase Agreement dated August 3, 2010, Schedule 1, Section 3; and First Amended Complaint, Paragraph 27.
[20] See First Amended Complaint, Paragraph 27.
[21] See First Amended Complaint, Paragraph 20.
[22] See 2011 Amended Forward Purchase Agreement dated January 3, 2011, Schedule 1, Section 3.
[23] See First Amended Complaint, Paragraph 35.

2011 Supplement, Ganymede paid STB another $175,000.[24]  Although STB had originally

estimated their entire fees to range between $2 and $3 million, STB was paid $8,775,000 from

December, 2009 through December, 2011 (both through financing from Ganymede and the

DRCA settlement).  The 2011 Agreement further provides that in the event May Debtors

recovered real estate from the litigation, then any split of proceeds would not include

maintenance and operation costs for the real estate.[25]  The 2011 Supplement also imposed the

interest rate of 30% per annum.[26]

On June 14, 2011, May Debtors obtained a unanimous jury verdict against NPP in the

amount of $110,658,800.[27]  On May 31, 2012, NPP assigned May Debtors 120 acres of Arizona

trust land located at Desert Ridge in Northeast Phoenix and the Master Development rights to

Desert Ridge to settle the verdict.[28]  Upon reaching this settlement, Ganymede demanded

immediate cash payment of 40% of the verdict amount,[29] and STB refused to continue

representing May Debtors unless May Debtors and Ganymede settled their dispute.[30]

From September 2012 through April 2013, May Debtors, Ganymede, and STB executed

a number of agreements and instruments relating to May Debtors' property interests at Desert

Ridge.  On October 29, 2012, Ganymede and May Debtors executed a Negative Pledge

Agreement pending the recording of liens.[31]  Ganymede also demanded Mr. Gray personally

---

[24] See Supplemental Agreement to Amended and Restated Forward Purchase Agreement dated December 29, 2011, Amendment 2, Section 2.2.

[25] See Supplemental Agreement dated December 29, 2011, Amendment 2, Section 2.3, Paragraph 5.  This amendment further provides: "To the extent any land and other non-cash assets are received as part of an NPP settlement, there will be deducted from the amount of the Proceeds any and all reasonable direct out of pocket expenses incurred and/or paid by [May Debtors] in connection with … any unreimbursed entitlement or similar costs incurred in connection with any delegation and fulfillment of master developer duties appurtenant to the non-cash assets …"

[26] See Supplemental Agreement dated December 29, 2011, Amendment 2, Section 2.3, Paragraph 4.

[27] See Final Judgment.

[28] See Settlement Agreement dated May 31, 2012, Section II, Paragraph A.

[29] Which the Court calculates to be $44,263,520 ($110,658,800 x .40 = $44,263,520).

[30] See First Amended Complaint, Paragraph 42.

[31] See Negative Pledge Agreement dated October 29, 2012.

guarantee a Negative Pledge Agreement.[32]  In December 2012, May Debtors and Ganymede signed an Outline of Terms ("Outline") providing a statement of amounts due to Ganymede ($50,713,000),[33] a proposed payment schedule to settle Ganymede's claim,[34] and a clause giving Ganymede a first priority lien on all of May Debtors' property, including 96 acres of the Arizona state trust land at Desert Ridge.[35]  The Outline required May Debtors to pay STB an additional $2,956,703.66, and included similar provisions securing the payment of this amount.[36]  Under the Outline terms, the sums due Ganymede and STB would bear interest compounded monthly at 35% and 6%, respectively.[37]  The Outline, however, gave May Debtors incentive to pay the amounts due sooner rather than later.  For instance, May Debtors could have paid Ganymede $18,439,000 on or before June 30, 2013 to settle Ganymede's claim in full.[38]

In April 2013, the parties executed promissory notes,[39] deeds of trust,[40] and a Subordination Agreement (from STB in favor of Ganymede).[41]  Collectively, these documents memorialized the terms of the Outline and Negative Pledge Agreement ("2013 Agreements") and granted Ganymede and STB liens on a 96 acre parcel at Desert Ridge and all of May Debtors' personal property.[42]  Ganymede and STB recorded UCC-1 financing statements after May Debtors signed the 2013 Agreements.[43] Neither Ganymede nor STB had filed UCC-1 financing

---

[32] See Guaranty dated October 29, 2012.

[33] See Outline of Terms dated December 12, 2012, Section II, Paragraph A.

[34] See Outline, Exhibit A.

[35] See Outline, Section II, Paragraph D, and Section IV.

[36] See Outline, Section III, Paragraph A, and Section IV, Paragraphs A and B.

[37] See Outline, Section II, Paragraph H, and Section III, Paragraph A.

[38] See Outline, Exhibit A.

[39] See Ganymede Promissory Note dated April 22, 2013, and STB Promissory Note dated April 22, 2013.

[40] See Ganymede Deed of Trust dated April 22, 2013, and STB Deed of Trust dated April 22, 2013.

[41] See Subordination and Intercreditor Agreement dated April 22, 2013.

[42] May Debtors, STB, and Ganymede also executed a document entitled Second Supplemental Agreement and Amendment Relating to Restated and Amended Forward Purchasing Agreement dated April 22, 2013.  The Second Supplemental Agreement incorporated the terms of the Outline.

[43] See U.C.C. Financing Statements recording numbers 2013-173-8764-3 and 2013-173-9095-6.

statements from 2008 through 2013.[44] STB later assigned its interest in the 2013 Agreements to Ganymede.[45]

In March 2015, and while May Debtors were not in default under the 2013 Agreements, Ganymede marketed its interests in the 2013 Agreements for $30.6 million. Although then due under the 2013 Agreement was $50.7 million.[46] Ganymede's decision to aggressively market and sell its interest made it difficult for May Debtors to sell parcels at Desert Ridge, and obtain any sort of cash flow to operate its business.[47]

On January 14, 2016, Ganymede filed a notice of trustee's sale pursuant to the 2013 Agreements.[48] On March 23, 2016 and May 5, 2016, Ganymede sold and assigned its interest in the 2013 Agreements to CPF Vaseo Associates, L.L.C. ("CPF").[49] In an email, CPF's principal, Robert Flaxman, described the acquisition as "a juicy new deal."[50] The sale agreement between Ganymede and CPF contains limitations of Ganymede's liability arising out of fraud (if any), and disclosure to CPF of May Debtors' litigation threats against Ganymede.[51] The sale agreements did not provide CPF with complete disclosure of Ganymede's dealings with May Debtors and STB.[52]

## THE ADVERSARY COMPLAINT

May Debtors filed for relief under Chapter 11 of the United States Bankruptcy Code on May 16, 2016. On July 19, 2016, May Debtors filed an Adversary Complaint ("the Complaint")

---

[44] In fact, the Amendment to STB's Engagement Letter provides: "[STB] represents that it currently has no perfected statutory or regulatory liens in the litigation matters in which it is representing [May Debtors]."

[45] See Assignment of Beneficial Interest in Deed of Trust, Assignment of Rents, and Security Agreement and Fixture Filing (STB) dated April 29, 2016.

[46] See HHF Listing (undated).

[47] See First Amended Complaint, Paragraph 64.

[48] See Notice of Trustee's Sale and Notification of Disposition of Personal Property dated January 12, 2016.

[49] See Assignment of Beneficial Interest Under Deed of Trust dated May 5, 2016, and Assignment of Beneficial Interest Under Deed of Trust (STB-Ganymede) dated May 5, 2016.

[50] See Email dated March 30, 2016 from Robert Flaxman.

[51] See Assignment of Interest Under Assignment of Rights as Master Developer and Declarant dated May 5, 2016, and Sale and Assignment Agreement dated March 23, 2016 (filed under seal).

[52] See First Amended Complaint, Paragraph 73.

against CPF seeking to avoid CPF's lien on the Desert Ridge property alleging fraudulent conveyance, equitable subordination, and recharacterization. CPF filed a motion to dismiss the Complaint, which the Court granted after oral argument on October 5, 2016. Specifically, the Court found that May Debtors failed to allege specific facts to characterize Ganymede's financing as an equity interest. The Court further held that Ganymede's security interest in the 2013 Agreements constituted an exchange for a prior debt and therefore did not constitute a fraudulent transfer. The Complaint also failed to allege specific facts to indicate how May Debtors were insolvent at the time of the transfer, or how the debt made it impossible to pay bills as they came due. The Court did not find significant facts indicating undue control by Ganymede or STB over May Debtors, or that any controls were not normal for a typical, arm's-length lending agreement. Lastly, the Court held that May Debtors' claim against CPF as an insider may be foreclosed by Ganymede's assignment pursuant to the Ninth Circuit's decision in *In re the Village at Lakeridge, L.L.C.*, 814 F.3d 993 (9th Cir. 2016). The Court, however, gave May Debtors leave to amend the Adversary Complaint.

May Debtors filed their First Amended Complaint on November 28, 2016 ("First Amended Complaint"). CPF filed a Motion to Dismiss the First Amended Complaint on December 15, 2016 ("the Motion"), alleging that the First Amended Complaint is virtually identical to the original Complaint. Additionally, CPF alleges that the First Amended Complaint contains numerous irrelevancies, including allegations that Ganymede and STB coerced May Debtors, and that the 2009 Agreement expressly contradicts May Debtors' allegations. CPF also alleges that May Debtors were solvent during the 2013 Agreements, as they owned property allegedly worth over $100,000,000. Lastly, CPF argues that neither Ganymede nor STB were insiders because neither exercised the requisite degree of control over May Debtors.

May Debtors filed their Response to the Motion on January 6, 2017 ("Response"). May Debtors argue that the Forward Purchasing Agreement created an equity interest for Ganymede in the litigation proceeds because both parties had a shared interest in the acquired property rights.

The 2013 Agreement, May Debtors argue, converted this equity interest into a secured obligation. May Debtors allege this would constitute a fraudulent transfer as they received no value from the transfer, and because the debt rendered May Debtors insolvent. The issue of solvency, May Debtors argue, is a factual one that cannot be adduced at the complaint stage. May Debtors further allege that Ganymede and STB were non-statutory insiders whose conduct should be rigorously scrutinized. Furthermore, to support their equitable subordination claim, May Debtors argue that Ganymede and STB knew that May Debtors were undercapitalized at the time of the 2009 Agreements. Lastly, May Debtors allege that intent to create equity or debt has a subjective prong, and therefore should not be decided by a motion to dismiss.

CPF filed its Reply in Support of the Motion on January 20, 2017 ("Reply"). CPF alleges that the documents contradict May Debtors' legal conclusions, and that the latter should not be accepted as true. CPF also alleges May Debtors were balance sheet solvent on the date of the transfers, which supports dismissal of the fraudulent transfer claim. CPF further claims Ganymede and STB only exercised control over the litigation (at most), and not over May Debtors directly. Lastly, CPF argues May Debtors failed to respond to the multi-factor test for recharacterization argued in its motion.

At oral argument on the Motion held February 2, 2017, the parties cited to case law and the documents in support of their separate positions. The Court took the matter under advisement. The Court now rules that the Motion should be granted in part, and denied in part.

## LEGAL ANALYSIS

### A.     MOTION TO DISMISS STANDARD

Federal courts apply a two-step process when analyzing a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Rule 7012, Federal Rules of

Bankruptcy Procedure.[53]  First, the court must isolate factual statements, which the court must accept as true, from conclusory remarks, which the court does not consider.  Second, the court considers whether those factual statements, standing alone, could plausibly state a claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  At the motion to dismiss stage, the court should interpret all material facts in the light most favorable to the non-moving party.  *Warfel v. City of Saratoga (In re Warfel)*, 268 B.R. 205, 209 (9th Cir. BAP 2001).  In the Ninth Circuit, the courts generally grant leave to amend a dismissed complaint unless amendment would not save the complaint.  *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

### B.      THE DOCTRINE OF JUDICIAL ESTOPPEL DOES NOT APPLY TO MAY DEBTORS' SOLVENCY ALLEGATIONS

CPF has alleged May Debtors should be judicially estopped from simultaneously claiming a property value of $127,000,000 and that the transfer left May Debtors insolvent.

Judicial estoppel prevents a claimant from adopting two contradictory or inconsistent positions in order to gain an unfair advantage.  *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996).  In *Rissetto*, the Ninth Circuit affirmed the District Court's application of judicial estoppel to the recipient of worker's compensation who subsequently filed suit alleging age discrimination.  The court held that the plaintiff was judicially estopped from making the inconsistent claims of (1) being unable to work and (2) performing her job adequately.  *Id.* at 605-06.

This reasoning is inapplicable to the present case as the merits of May Debtors' case have not been judged by this Court, or any other court.  At the complaint stage, courts "allow pleadings in the alternative – even if the alternatives are mutually exclusive."  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir. 2007).  Additionally, the complaint stage is an inappropriate time for any court to rule with certainty on the alternative allegations contained in

---

[53] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

Case 2:16-ap-00334-MCW    Doc 77    Filed 06/02/17    Entered 06/05/17 14:39:35    Desc
Main Document    Page 10 of 25

the complaint as discovery has not yet commenced. This allows claimants to "shape their allegations to conform to these newly discovered realities." *Id*. Thus, May Debtors are not precluded from asserting the alleged value of the property and that they were insolvent, especially at this early stage of the litigation.

## C. NEITHER GANYMEDE NOR STB COULD HAVE PLAUSIBLY BEEN JOINT VENTURERS OF MAY DEBTORS

Counts I (Fraudulent Transfer) and III (Recharacterization) of the First Amended Complaint rely upon characterizing CPF's claim as an equity investment or as a non-arm's-length loan from a disinterested creditor. If the 2013 Agreements secured an antecedent debt, then the transaction would not qualify as a fraudulent conveyance as alleged in Count I. *See Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 841-42 (Bankr. S.D.N.Y. 2005). Secondly, if the transaction cannot be recharacterized as an equity interest as a matter of law, then Count III would necessarily fail.

May Debtors cite *In re Fitness Holdings* as stating the legal standard for recharacterization in the Ninth Circuit. In that case, the Ninth Circuit agreed with the Fifth Circuit in holding that recharacterizing a "debt" or "claim" under the Bankruptcy Code requires engaging in a *Butner* analysis by applying state law. *Official Comm. Of Unsecured Creditors v. Hancock Park Capital, II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1149 (9th Cir. 2013) ("Such an equitable approach is consistent with Supreme Court precedent requiring us to determine whether a party has a 'right to payment,' i.e., a 'claim,' § 101(5), by reference to state law.").

May Debtors then direct the Court to a California decision authored before *In re Fitness Holdings* in which the court stated "the Ninth Circuit has never addressed whether bankruptcy courts have the authority to recharacterize debt into equity." *Daewoo Motor Am., Inc. v. Daewoo Motor Co. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 730 (C.D. Cal 2012). In *Daewoo*, the court applied federal tax law precedent in its recharacterization analysis by examining the

objective and subjective intent of the parties. *Id.* The Ninth Circuit later affirmed *Daewoo* post-*In re Fitness Holdings* as the parties stipulated that California state and federal law applied an identical multi-factor test to characterizing a transaction as a loan or equity investment. *In re Daewoo of Am., Inc.,* 554 Fed. Appx. 636, 639 (9th Cir. 2014). May Debtors applied the factors stated in *Daewoo* without providing any legal basis as to whether these same factors would apply under Arizona law. CPF, on the other hand, offered a nine-factor test for the Court's consideration, but failed to identify any legal basis for the test.[54] Instead, CPF argues the Court should be bound by CPF's nine-factor test because of May Debtors' failure to respond. Following *In re Fitness Holdings*, the Court will apply Arizona law to May Debtors' recharacterization claim in the First Amended Complaint.

May Debtors alleged numerous times throughout the First Amended Complaint that the equity interests of Ganymede and STB were in the nature of joint ventures. As such, the Court will apply Arizona law of joint ventures to the First Amended Complaint, but will first analyze CPF's contention relating to inconsistent allegations between the exhibits and the First Amended Complaint.

> **1.     The Court will accept as true factual allegations contained in the First Amended Complaint that contradict the attached exhibits.**

As an initial matter, the Court notes that some of May Debtors' allegations in the First Amended Complaint directly contradict the 2009, 2010, and 2011 Agreements. Although federal courts must accept all allegations in a complaint as true, courts are not "required to accept as true conclusory allegations which are contradicted by the documents referred to in the complaint." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (quoting *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th Cir. 1998)). Where a matter proceeds past the complaint stage, courts have held that the parol evidence rule does not apply to fraudulent transfer actions in bankruptcy cases for two reasons. First, the policy of fraudulent transfer

---

[54] Outside the Ninth Circuit, courts commonly use an eleven factor test articulated by the Sixth Circuit in *Bayer Corp. v. Mascotech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001).

actions is to uncover the "true nature" of the transaction, and the parol evidence rule would necessarily act as a "false prophet" by preventing this role. Second, under Bankruptcy Code Section 544(a)(1) and (b), the debtor-in-possession steps into the shoes of a lien creditor without notice, and the parol evidence rule does not apply to third-parties. *Alberts v. HCA, Inc. (In re Greater Se. Comty. Hosp. Corp. I)*, 365 B.R. 315, 318 (Bankr. D.C. 2007) (quoting *In re Zedda*, 103 F.3d 1195, 1206 (5th Cir. 1997)).

The Court shares CPF's concerns relating to the inconsistent allegations contained in the First Amended Complaint and the attached exhibits, but holds that the policy of allowing extrinsic evidence for fraudulent transfers outweighs any special significance to the exhibits attached to the First Amended Complaint. In its Motion and Reply, CPF failed to identify with specificity how the exhibits contradict the allegations in the First Amended Complaint, and as such the Court has conducted its own analysis. After reviewing the exhibits, the Court finds few allegations that directly contradict the exhibits, and most of these are legal conclusions which the Court is not obligated to accept as true. For instance, the First Amended Complaint alleges a joint venture with Ganymede, an allegation which the Court is not obligated to accept as true. The First Amended Complaint also alleges the documents were contracts of adhesion, which the Court does not accept as true, but the Court does accept as true the conditions under which the documents were signed. This would include the allegations that STB refused to continue workinf, and refused to allow May Debtors to provide suggestions and changes to the numerous agreements executed by the parties. If the Court did not accept these allegations as true, then the fraudulent nature of the transaction, if it exists, might never be brought to light. To put it another way, it would simply be illogical to not assume a factual allegation relating to reasonably equivalent value as true where the contract expressly provides otherwise. The same logic would apply to the nature of the transaction as a joint venture, or as an arm's-length loan transaction if the purpose of the allegation is to characterize the transaction as a fraudulent transfer.

The Court therefore assumes May Debtors' factual allegations relating to the existence of a joint venture, even those that contradict the attached exhibits, are true.

### 2.    The First Amended Complaint fails to plausibly provide a claim of joint venture between May Debtors and Ganymede.

In Arizona, a joint venture is created where two or more persons enter into a particular enterprise in the hope of sharing a profit.  *Arizona Pub. Serv. Co. v. Lamb*, 84 Ariz. 314, 317 (1958).  Joint ventures differ from partnerships in that the former are typically limited to a single transaction.  *Rubi v. Transamerica Title Ins. Co.*, 131 Ariz. 403, 406 (1981).  The five elements of a joint venture are: (1) an agreement; (2) a common purpose; (3) a community of interest; (4) an equal right of control; and (5) participation in profits and losses.  *Estate of Hernandez v. Flavio*, 187 Ariz. 506 (1997).

Elements 2 and 3 are satisfied with regard to Ganymede's interest.  The 2009 Agreement creates a common purpose between Ganymede and May Debtors to successfully litigate claims against NPP.  It also creates a community of interest in express terms (that the parties have a "common legal interest" in pursuing the litigation claim).  Additionally, although Ganymede was under no obligation to continue funding the litigation, it issued new funds on three separate occasions, and increased the amount funded from $6,000,000 initially to over $8,700,000 by the end of the litigation.  Such behavior coupled with the nature of the investment goes beyond a simple lending transaction between a debtor and creditor and rises to the level of two independent actors participating in a common, mutually beneficial enterprise.

The allegations in the First Amended Complaint, however, fail to plausibly satisfy elements 1, 4, and 5.  The 2009, 2010, and 2011 Agreements expressly disclaim the existence of a joint venture, and the First Amended Complaint does not provide any extrinsic factual allegations indicating that the parties agreed to create a joint venture.  That Ganymede took a security interest in all of May Debtors' property would tend to cut against an agreement to form a joint venture.  Although May Debtors stress throughout the First Amended Complaint that they

lacked control over the litigation, these allegations ring hollow. The test of right to control is "whether there is a right of mutual control over the subject of the venture, that is, the means by which the parties intend to obtain their objective." *Ellingson v. Sloan*, 22 Ariz. App. 383, 386-87 (1974).

May Debtors assert that the status of their litigation financier should be converted to that of an insider. They allege that the parties' agreements are contracts of adhesion entered into without opportunity for modification and under duress because Ganymede and STB demanded payment and threatened May Debtors with default. It is not plausible that such demands and threats are wrongful when done in pursuit of existing rights and available remedies. Here, May Debtors' First Amended Complaint acknowledges Ganymede and STB having provided significant money and services for complex litigation that ended successfully. Even taking the alleged threats and demands as true, they do not rise to the level of control necessary for them to be converted to insider status.

May Debtors do not allege that Ganymede made decisions relating to litigation strategy, assisted in the litigation in any manner, or attended depositions, trials, or other proceedings. In fact, the only outright 'control' May Debtors allege is Ganymede's threat to take control of the litigation, but it does not allege that this threat was ever carried out. May Debtors allege that Ganymede commandeered invoicing and costs of the litigation, but this fact alone does not support the parties equally controlling what appears to have been multi-faceted, complex litigation. Lastly, Element 5 is not satisfied because, as alleged, Ganymede had no obligation to continue paying May Debtors' litigation costs. Additionally, pursuant to the 2009 Agreement, Schedule 2, May Debtors appear to always have been liable to Ganymede for at least the Prepaid Amount.

For the foregoing reasons, the Court rules that the First Amended Complaint fails to plausibly allege a joint venture between Ganymede and May Debtors.

### 3. The First Amended Complaint fails to plausibly allege a joint venture between May Debtors and STB.

For similar reasons stated above, the Court further finds that the First Amended Complaint fails to create a joint venture between May Debtors and STB. May Debtors cite to *Waterman v. Rabinovitz* as authority for the proposition that once an attorney changes compensation terms from hourly to contingent, then the attorney becomes a joint venturer. The Court does not read *Waterman* so broadly. In that case, an attorney handling a malpractice claim engaged a second attorney to assist with the claim on appeal. Although the second attorney originally was to be paid on an hourly basis, the attorneys modified the agreement so the second would be paid on a contingent fee basis. *Waterman v. Rabinovitz*, 161 Ariz. 511, 513 (App. 1989). The Arizona Court of Appeals held that the attorneys created a joint venture because both shared in the profits, and had an equal right to control the pleadings and discovery. *Id.* at 829-830.

It would not make sense to apply *Waterman* to an attorney-client relationship because an attorney owes fiduciary duties to a client beyond those of a joint venture relationship. Characterizing the relationship as a joint venture would likely jeopardize other duties contained in the Arizona Rules of Professional Conduct, including Rule 1.6 concerning confidentiality of information during the client-lawyer relationship.

As against STB, none of the five elements for a joint venture are present. The facts as alleged do not show that May Debtors and STB intended to create a joint venture through the Amended Engagement Letter. The parties did not have a common purpose because STB's purpose was to represent its client's interests in the litigation, and May Debtors' purpose was to obtain a successful settlement or verdict. The parties lack a community of interest as well in this regard because STB's interests in the litigation would inherently require maximizing benefits to its client, even if that meant losing benefit for itself. For example, assuming May Debtors desired to settle the claim for less than what STB believed it could have been settled for, then STB still

would have been bound by its client's decision.  For this similar reason, STB lacked an equal right of control over the litigation as the client has final decision making power over all aspects of the litigation.  Lastly, there is nothing to indicate that STB would share in any losses provided May Debtors were not successful in prosecuting the claim.

For the foregoing reasons, the Court rules that May Debtors have failed to plausibly allege facts indicating that Ganymede and STB were joint venturers in the litigation claim.   As such, the Court therefore dismisses Count III (Recharacterization) of the First Amended Complaint.

### D.   THE FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR FRAUDULENT CONVEYANCE UNDER A.R.S. §§ 44-1001 *et. seq*.

Section 544(b) of the Bankruptcy Code allows the trustee to avoid transfers under applicable non-bankruptcy law.  In this case, the governing law is the Uniform Fraudulent Transfer Act as codified in Arizona Revised Statutes ("A.R.S.") §§ 44-1001, *et. seq.* For fraudulent transfer purposes, federal precedent informs state law, and vice versa.  *In re Viscount Air Servs., Inc.*, 232 B.R. 416, 434 (Bankr. D. Ariz. 1998) (quoting 5 *Collier on Bankruptcy* § 548.LH (15th ed. 1998)).  As May Debtors have pleaded both actual and constructive intent to defraud under A.R.S. §§ 44-1001, *et. seq.*, the Court will address each claim in turn.

### 1.   The First Amended Complaint fails to state a claim of actual intent under A.R.S. § 44-1004(A)(1).

A transfer may be fraudulent where the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.  A.R.S. § 44-1004(A)(1).  Actual intent may also be proven by the "badges of fraud" as stated in A.R.S. § 44-1004(B)(1) – (B)(11).[55]

_____

[55] The badges of fraud as stated in the statute are:

    1. The transfer or obligation was to an insider.

    2. The debtor retained possession or control of the property transferred after the transfer.

    3. The transfer or obligation was disclosed or concealed.

    4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

May Debtors generally allege that Ganymede and STB were insiders, that May Debtors did not receive reasonably equivalent value for the 2013 Agreements, and that the transfers made May Debtors insolvent.  May Debtors did not allege any of the other badges of fraud, but the Court finds the following badges to be plausibly present: May Debtors retained possession of the property (A.R.S. § 44-1004(B)(2)) and  Ganymede threatened May Debtors with suit (A.R.S. § 44-1004(B)(4)).  None of the remaining badges are present in this case.

For the reasons stated more fully below, the Court holds that CPF cannot be an insider of May Debtors as a matter of law.  As such, the Court does not find this badge of fraud (A.R.S. § 44-1004(B)(1)) to be present.

As a matter of law, Ganymede and STB gave reasonably equivalent value for the transfer because the transfer secured an antecedent debt.  *AppliedTheory Corp.*, 323 B.R. at 841-42; *see also In re Pfeifer*, 2013 WL 3828509, *4 (Bankr. S.D.N.Y. July 23, 2013).  Similar to the facts in *AppliedTheory Corp.*, May Debtors received substantial benefits from Ganymede and STB. Without Ganymede's investments in the 2009, 2010, and 2011 Agreements, May Debtors would not have been able to pay STB or to complete the litigation.  Through STB, May Debtors realized

---

5. The transfer was of substantially all of the debtor's assets.

6. The debtor absconded.

7. The debtor removed or concealed assets.

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

A.R.S. § 44-1104(B).

a settlement of $6,000,000, and a verdict of over $110,000,000. The benefits received by May Debtors wholly derived from the investments and work of Ganymede and STB.

The First Amended Complaint does not plausibly provide a claim that May Debtors were insolvent, or became insolvent, as a result of the transfer. Paragraph 99 of the First Amended Complaint provides only unsupported conclusions concerning insolvency; and to the extent that there are factual allegations in that paragraph, they do not directly support whether the May Debtors were solvent or not.[56] The value of the property at the time of the transfer has not been established. Additionally, it has not been established whether May Debtors were paying their bills as they came due pursuant to A.R.S. § 44-1002(B). Thus, May Debtors have not plausibly alleged that the transfers rendered them insolvent, or that they were insolvent at the time of the transfer.

Only three of the eleven factors for actual intent under A.R.S. § 44-1004(B) are present, and these factors do not plausibly support an inference of actual intent to hinder, delay, or defraud any creditor of May Debtors. May Debtors retained possession of the property after the transfer. Second, the transfer occurred as the result of Ganymede's threat to file suit, but the security interest arguably benefited May Debtors as it gave them breathing space to deal with Ganymede's and STB's claims. Lastly, even assuming that May Debtors were insolvent at the time of the transfer, the transfer secured an antecedent debt for which May Debtors were liable regardless of the transfer.

For the foregoing reasons, Count I relating to actual intent to defraud under A.R.S. § 44-1004(A)(1) is dismissed with prejudice as to both Ganymede and STB. The Court further finds

---

[56] For example, paragraph 99 includes the statement that "[t]he Transfer subjected all of the Estate's assets to alleged secured claims totaling in excess of $54,000,00 at the time of the transfer." While this is a factual allegation, it does not directly bear on whether the May Debtors were solvent or not. Similarly the allegation that Debtors received no additional funding from either Ganymede or STB may be factual allegations, but they do not directly support the conclusion that the Debtors were actually made insolvent by the transfer.

that because alleging joint venture with Ganymede and STB is futile, the claim of actual intent to defraud under Count I must be dismissed with prejudice.

**2.      The First Amended Complaint fails to plausibly state a claim of constructive fraud under A.R.S. § 44-1005.**

A transfer can be fraudulent as to present creditors whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.  A.R.S. § 44-1005.

The same reasoning stated in Section (D)(1) applies to constructive fraud.  The Court finds as a matter of law that the transfers secured an antecedent debt, and that securing an antecedent debt means that May Debtors received reasonably equivalent value for the transfer. Further, the Court holds that May Debtors have not plausibly alleged that they were insolvent at the time of the transfer, or that the transfer made them insolvent.

For the foregoing reasons, Count I relating to constructive fraud under A.R.S. § 44-1005 is dismissed as to Ganymede and STB.  The Court further finds that because alleging joint venture with Ganymede and STB is futile, Count I must be dismissed with prejudice.

**E.      THE FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR EQUITABLE SUBORDINATION AGAINST GANYMEDE, BUT MAY STATE A CLAIM AGAINST STB.**

Courts may equitably subordinate claims under 11 U.S.C. § 510(c) where (1) a claimant engaged in some type of inequitable conduct; (2) the inequitable conduct injured creditors or conferred unfair advantage on the claimant, and (3) subordination would not be inconsistent with the Bankruptcy Code.  *Henry v. Lehman Commercial Paper, Inc.*, *(In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006).  Subordination of claims between the debtor and an insider requires the court to give the insider's actions rigorous scrutiny.  *Stoumbos v. Kilimnik*, 988 F.2d 949, 959 (9th Cir. 1993) (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re*

*Fabricators, Inc.*), 926 F.2d 1458, 1465 (5th Cir. 1991)). Gross and egregious conduct is required to subordinate non-insider acts, and must be proven with particularity. *First Alliance Mortg. Co.*, 471 F.3d 977 at 1006. Inequitable conduct can be shown by: (1) fraud, illegality, or breach of fiduciary duty; (2) undercapitalization; or (3) using the debtor as a mere instrumentality or alter ego. *Fabricators*, 926 F.2d 1458 at 1467.

May Debtors alleged in the First Amended Complaint that Ganymede and STB were insiders of May Debtors. Reviewing the relevant case law, the Court concludes May Debtors have failed to plausibly state this claim.

### 1. CPF cannot be an insider of May Debtors as a matter of law because insider status cannot be assigned.

The courts recognize two types of insiders: statutory and non-statutory. *Village at Lakeridge*, 814 F.3d at 999. Statutory insiders for corporate debtors are listed in § 101(31)(B)(i)-(vi) and include directors, officers, persons in control, partnerships of which the debtor is a general partner, general partners of the debtor, or relatives of a general partner, director, officer, or person in control of the debtor. Two factors determine whether a party is a non-statutory insider: (1) the closeness of the relationship between the parties, and (2) whether the parties' transactions were conducted at arm's length. *Id.* at 1001.

The Ninth Circuit has held that insider status relates to the party, rather than the claim, and once the assignor assigns the claim it loses its insider status as to the assignee. Otherwise, a non-insider could assign a claim to an insider and the claim would retain its non-insider status. In *Village at Lakeridge* the Ninth Circuit, however, did not rule on whether non-statutory insider status would be affected by transfer or assignment because the assignor there was indisputably a statutory insider. The Court instead analyzed whether the assignee was a non-statutory insider. *Id.* at 1001-03 (certiorari granted on standard of review for non-statutory insiders, *U.S. Bank Nat'l Assoc. v. Village at Lakeridge, L.L.C.*, ___ U.S. ___, 137 S.Ct. 1372 (2017)). Regardless, the reasoning of *Village of Lakeridge* supports the conclusion that it is immaterial whether a

claimant is classified as a statutory or non-statutory insider because it is the status of the claimant, rather than the claim, that matters for the purposes of insider status.

Thus, even if STB and Ganymede could plausibly have been statutory or non-statutory insiders, the Court cannot conclude that CPF, as assignee, became an insider as a result of the assignment. May Debtors argue that *Village at Lakeridge* should be confined to its facts; they argue insider status should not transfer for the purposes of voting, but should transfer where a party accepts assignment with notice of potential inequitable conduct. There is some merit to this contention. Preventing suit against an assignee of an insider would effectively insulate the assignee from the rigorous scrutiny standard. But nothing in *Village at Lakeridge* seemed to confine its ruling to the facts of the case. The Court held instead: "Insider status pertains only to the claimant; it is not a property of a claim." 814 F.3d at 1000. "Because insider status is not a property of a claim" and "general assignment law … does not apply." *Id*.

As May Debtors cannot prove CPF was an insider as a matter of law, the Court must analyze May Debtors' equitable subordination claim under the gross and egregious standard.

> **2.     The First Amended Complaint fails to plausibly state a claim for equitable subordination under the gross and egregious standard against Ganymede but does plausibly state a claim against STB.**

A debtor can equitably subordinate an ordinary creditor under very few circumstances. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Circuit 1990). Various courts have labeled the standard as "gross and egregious, tantamount to fraud, overreaching, spoliation, or involving moral turpitude." *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994)). Others have called it an "unusual remedy which should be applied in limited circumstances." *White Family Co., Inc. v PNC Bank (In re Dayton Title, Inc.)*, 527 B.R. 289, 301 (Bankr. S.D. Ohio 2015) (quoting *Bayer Corp. v. Mascotech, Inc. (In re AutoStyle*

*Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001)). Mere negligence or breach of the duty of care does not rise to the level of inequitable conduct required to subordinate a claim. *Dayton Title*, 527 B.R. at 302. Nor does it generally apply where a creditor asserts rights pursuant to a contractual agreement. *Smith v. Assocs. Commercial Corp (In re Clark Pipe and Supply Co., Inc.)*, 893 F.2d 693, 700-01 (5th Cir. 1990); *Waslow v. MNC Commerical Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 120 (E.D. Pa. 1993). Exploitative conduct resulting from "a hard-earned advantage … legitimately acquired … through a series of arm's-length transactions" has been held not to be conduct warranting subordination. *Comm. of Unsecured Creditors v. Hoopes (In re Pittsburgh Cut Flower Co., Inc.)*, 124 B.R. 451, 462 (Bankr. W.D.Pa. 1991). Unless "the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show conduct involving fraud, illegality, or some other breach of a legally recognized duty." *80 Naussau Assocs.*, 169 B.R. at 840.

As pleaded in the First Amended Complaint, Ganymede's conduct does not rise to the level of fraud, illegality, or a breach of a recognized duty. May Debtors first approached Ganymede through their attorneys seeking income to fund their litigation. From 2008 through 2013, Ganymede appeared to behave as any ordinary, arm's-length creditor would have under the circumstances by using its capital and resources to obtain what it believed to be a worthwhile investment. The parties' documents evidencing the indebtedness support CPF's position in this regard. May Debtors were engaged in expensive and complex litigation and they ultimately needed to finance that litigation, resulting in the Forward Purchase Agreement and its various amendments and supplements. Eventually Ganymede demanded the payment to which it was entitled for financing the litigation. When May Debtors could not pay, the parties entered into the loan agreements. To secure the loans, May Debtors pledged the Desert Ridge property, and Ganymede and STB perfected their liens by recording their deeds of trust. All of these factors clearly favor CPF's argument that the relationship was one of a lender and borrower. Most

significantly, there are no allegations that Ganymede or STB participated in May Debtors' management. Although May Debtors assert duress, this is not the same as the right to manage.

The only 'fraud' alleged in the First Amended Complaint by Ganymede was its refusal to negotiate terms and conditions of a contract to fund an inherently risky investment. After the successful jury verdict, Ganymede merely exercised its contractually bargained-for rights in seeking to obtain proceeds of the litigation. In pursuit of this, Ganymede requested payment, and in lieu of payment May Debtors executed deeds of trust and promissory notes in Ganymede's favor. Additionally, Ganymede even offered to settle its amount due for a fraction of the amount it represented it was owed. None of this activity rises to the level of fraud. May Debtors also allege no illegality or breaches of fiduciary duties as against Ganymede, and as such the First Amended Complaint for equitable subordination against Ganymede must fail.

May Debtors could plausibly have a claim against STB for breach of fiduciary duty which, if proven, may justify equitable subordination. "Attorneys are fiduciaries with duties of loyalty, care, and obedience, whose relationship with the client must be one of 'utmost trust.'" *Webb v. Gittlen*, 217 Ariz. 363, 367 (2008) (quoting *In re Piatt*, 191 Ariz. 24, 26 (1996)). Assuming the facts of the First Amended Complaint are true, then it is plausible that STB breached its duty of loyalty to May Debtors. It is alleged that on numerous occasions, STB actively worked against the interests of its client, causing duress. For instance, STB told Mr. Gray, the principal of its client, that he was "in no position to negotiate." STB also used its position with Ganymede to inflate its fees and costs while failing to provide its client with an accounting of those fees. STB threatened to resign as May Debtors' counsel unless May Debtors agreed to Ganymede's demands, thus further violating its general duty of loyalty to May Debtors. Worst of all, STB negotiated a contract with a party holding adverse interests to its client *without consulting* its client, or permitting its client to suggest changes.

It is equally plausible that the facts as alleged could allow the Court to conclude that STB breached its duty of care to May Debtors. After the NPP settlement, Ganymede began demanding

payment from May Debtors. Rather than protect its clients' interests, STB refused to perform any work and instead demanded a settlement between May Debtors and Ganymede. If proven, this act could have resulted in a much larger liability for May Debtors in Ganymede's favor.

In sum, STB's conduct as alleged in the First Amended Complaint is the type of "gross and egregious" behavior which may justify application of equitable subordination. As such, the Court denies CPF's Motion to Dismiss Count II to equitably subordinate CPF's claims deriving from STB.

The Court grants CPF's Motion to Dismiss Count II to equitably subordinate CPF's claims deriving from Ganymede with prejudice.

### F. CLAIM OBJECTION

For the reasons stated above, May Debtors' objection to the claim of CPF as stated in the Complaint at Count IV is dismissed, except for that portion relating to CPF's claims arising from STB. The Court further notes that there is a separate contested matter currently pending that raises additional bases objecting to CPF's claims. That objection is not resolved by this memorandum decision.

### <u>CONCLUSION</u>

In sum, May Debtors have failed to plead facts sufficient to support a claim for fraudulent transfer, equitable subordination, or recharacterization of the financing debt into equity. For the foregoing reasons, CPF's Motion to Dismiss is:

GRANTED with prejudice as to Counts I and III;

GRANTED with prejudice as to CPF's claims deriving from Ganymede in Count II, and DENIED as to CPF's claims deriving from STB in Count II; and

GRANTED in part as to Count IV.

**DATED AND SIGNED ABOVE.**